RENO TURF CLUB, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reno Turf Club, Inc. v. Commissioner
Docket No. 8257-75.
United States Tax Court
T.C. Memo 1979-381; 1979 Tax Ct. Memo LEXIS 149; 39 T.C.M. (CCH) 172; T.C.M. (RIA) 79381; September 17, 1979, Filed Jerome L. Blut, for the petitioner. Gregory A. Robinson, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the years ended December 31, 1971 and December 31, 1972, in the respective amounts *150 of $24,175.63 and $15,926.67. The issue for decision is whether petitioner is entitled to deduct as a loss under section 165, I.R.C. 1954, [1] a cash shortage discovered by its manager and sole stockholder in 1972 in either of the years here in issue and, if so, the proper amount of the deduction. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, a Nevada corporation with its principal place of business in Reno, Nevada, at the time of the filing of its petition in this case, filed corporate income tax returns for the calendar years 1971 and 1972. During the years in issue petitioner operated a sports and race bookmaking business in Reno, Nevada. It took bets on horse races at all major tracks and on major sporting events. Petitioner maintains its books and records and reports its income on the cash basis method of accounting. Harmon North Swanson was the president and sole shareholder of petitioner. Mr. Swanson purchased petitioner's stock in 1960, and petitioner commenced *151 business on January 1, 1961. For a few years Mr. Swanson was an absentee owner. He lived in Los Angeles with his family, where he served as vice president and general manager of his father's retail lumber business. In 1965, the lumber business was sold, and Mr. Swanson moved to Reno to take over active management of petitioner. For sometime prior to 1965, Mr. Clinton J. Dalton was the manager, cashier and bookkeeper of petitioner. When Mr. Swanson came to Reno in 1965, he took over as manager of petitioner, but Mr. Dalton continued to be the bookkeeper and the cashier for the race book. Petitioner was not a very profitable enterprise prior to 1970, but in 1970 two of petitioner's competitors went out of business,and petitioner's business increased substantially. Petitioner had between eight and ten employees. There were one or two board markers, who posted on a board the results of the races and scroes of the various games, upon which bets might have been placed. There were several ticket writers, who accepted wagers, wrote bet slips or "tickets," and collected the ten percent Federal wagering tax. Either at various times during the day or at the end of the day, the ticket *152 writers would send copies of the "tickets" to the cashier who would file them, so that a "ticket" could be easily found if it were a winner. There was a cashier for the race books on duty at all times. If the regular cashier were at lunch or had a day off, a substitute wold take his place. Mr. Swanson usually acted as cashier of the sports book. Throughout the day the cashier paid off the winning bets in cash. Mr. Swanson spent most of his time at petitioner's place of business, overseeing its activities. In 1971, Mr. Swanson received a salary of $8,910 from petitioner. During 1971 there were at least three race book writers on duty all day and sometimes four. Most of the time there was only one sports book writer. But sometimes, particularly on Saturday morning when a number of customers wished to play football cards, the race book writers would take cards and run them through the machine and hand the money to Mr. Swanson. When a customer wished to place a bet on a horse, he would come to a race book writer and tel him the name or number of the horse, andthe track at which the horse was running. The writer would write a ticket on a machine. The machine produced two copies *153 of the ticket. The original ticket ws turned over to the customer. The ticket writer kept one copy of the ticket and one copy remained inthe machine. The ticket writer would collect the money from the customer together with a ten percent Federal wagering tax. At the end of the day, a ticket writer would total up the amounts entered on all tickets he had written. At this time he would take the cash in his drawer to the cashier. Together they would count the cash to see that it equaled the total of the amounts on tickets written by him. At the beginning of each day, each writer took a cash amount, usually $50. This amount and the amount of the ten percent wagering tax were subtracted from the cash count of the writer's drawer to arrive at the amount of money which had been wagered with the writer. Occasionally Mr. Dalton would add up the tickets written by the race book writers to verify that their additions of the tickets turned into him were correct, but he never found any discrepancies. The cashier would add up the amounts paid on winning bets. The difference between the money taken in and the amount paid out determined the profit or loss for the day. The cash received *154 as wagers, cash paid out on winning bets and the profit or loss for the day were entered onthe daily ledgers. At the end of the month, the total fo the daily figures was transferred to the general ledger. The monthly profit or loss on wagering was entered on the ledger under "income." Petitioner's general ledger shows an income in 1971 from betting activities of $254,414.65. At the end of the day, there was a count of the cash in the cashier's drawer for insurance purposes, but there was no attempt to reconcile the amount of cash in the cashier's drawer with amounts received and paid out. Sometimes Mr. Swanson would take money from the drawer of the race book cashier to put in the sports book cashier's drawer and sometimes the cashier for the race book writers would take money from the sports book cashier to use in the race book cashier's drawer. For this reason, it would have been difficult under the system used by petitioner to reconcile the cash in the cashiers' drawers with receipts and payouts. Mr. Swanson, in the view of some of his employees, maintained a lax attitude toward accounting procedures. Mr. Swanson did not himself do any bookkeeping. Mr. Dalton reconciled bank *155 statements with bank deposits and checks written, but he did not attempt to verify that there was cash on hand as reflected in petitioner's records. Sometimes Mr. Dalton made bank deposits, but generally these deposits were made by Mr. Swanson. Although there was no correlation between the amounts of cash taken inand amounts deposited, Mr. Dalton and Mr. Swanson would generally count the money to be taken to the bank for deposit together and check the deposit slips from the bank against this amount. Petitioner's general ledger reflects a total of $375,676.30 in bank deposits in 1971. Usually deposits were made on a daily basis. It would be necessary to retain some cash each day at the place of business to pay off winning bets at the beginning of the following day since wagers were received in advance of the event in some instances and not all winning tickets were presented for payment the same day as the event occurred. Therefore neither deposits nor deposits plus cash onhand would check withthe total amounts received from bets or the gross income account. Mr. Swanson kept approximately $7,000 in cash in the safe on petitioner's business premises and $2,000 of petitioner's *156 money on his person. These amounts were covered by insurance against theft or burglary. Mr. Swanson kept track of the amount of money in the safe for insurance purposes. The only insurance petitioner had against a loss of cash was for $7,000 from the safe on the premises and $2,000 from the person of an employee of petitioner. When Mr. Swanson or Mr. Dalton would count the actual cash in the cashiers' drawers at the end of the day, if the amount was over $7,000 plus $2,000 that Mr. Swanson would take home with him and possibly up to $2,000 which he might have asked Mr. Dalton to take home with him, Mr. Swanson would take the excess cash and put it in a safe at the Horseshoe Club. Generally, petitioner did not have more than $10,000 cash on hand, but at times might have as much as $20,000. Mr. Swanson and employees of petitioner occasionally borrowed money from a cashier's drawer. When they did so, they would place a "marker" inthe drawer and repay the borrowed sum when they were paid. Sometimes Mr. Swanson and sometimes Mr. Dalton made personal or "head to head" bets. In 1971 Mr. Swanson made some such personal bets through a Mr. Bob Martin in Las Vegas. He accumulated a *157 loss of $20,000. In September 1971 a check of petitioner's was drawn to Mr. Bob Martin in payment of this debt of Mr. Swanson's, and Mr. Swanson's account with petitioner was charged with this $20,000 on petitioner's books. In 1974 Mr. Swanson took some sports wagers on behalf of petitioner without paying the ten percent excise tax to compete with certain unlicensed bookmakers who were taking business from petitioner in Reno. Officers of the State of Nevada came into Mr. Swanson's office at petitioner's business headquarters and found the bet cards. Mr. Swanson's license was taken and he sold his interest in petitioner. In 1971 an employee told Mr. Swanson that if he would supervise his business more closely, he would make more money. Mr. Swanson did not interpret this as an admonition that employees were taking cash from petitioner. Another employee, Mr. Fred Travella, a part-time ticket writer with an accounting background, repeatedly suggested to Mr. Swanson that some type of cash controls should be instituted. Without such controls, it would have been relatively simple for an employee to simply take cash from a cashier's drawer when other employees were nt looking. Mr. *158 Travella suggested a system of cash controlls, but Mr. Swanson questioned whether petitioner needed such an elaborate bookkeeping system since he considered his employees to be honest. However, Mr. Swanson in the latter part of 1971 put in a controls system for the sports book operations only. Early in 1972 Mr. Swanson gave petitioner's books to the accountant who prepared petitioner's Federal income tax returns. In mid-February 1972 the accountant called Mr. Swanson and asked him if petitioner actually had $108,000 [2] in cash on hand. Mr. Swanson expressed surprise and said that there had never been such a sum in cash on hand. Mr. Swanson contacted Mr. Travella, told Mr. Travella what the accountant had said, and asked Mr. Travella for his advice. Mr. Travella suggested that he and Mr. Swanson make a daily check to see if any cash was missing. A three-day check disclosed that the business was short approximately $1,200. *159 Mr. Swanson contacted a police officer who had on occasion placed bets with petitioner. The officer told Mr. Swanson to contact a police detective. Mr. Swanson contacted the detective and told him that he would like to have his employees take a polygraph test. The detective informed Mr. Swanson that in order for the police department to do this Mr. Swanson would have to file charges against the employees and suggested that Mr. Swanson contact a private polygraph businessman. Mr. Swanson contacted his lawyer who advised him not to file charges against any employee, because he lacked proof that any specific employee had taken money and because of the lack of a proper system of accounting for cash in petitioner's operation it would be difficult to show what had in fact happened to the cash. In addition, Mr. Swansonhs attorney advised Mr. Swanson that filing charges would serve no purpose, as in all likelihood Mr. Swanson would be unable to recover the money. Thereafter, Mr. Swanson contacted a private polygraph businessman, but he was told that no tests could be conducted for some 90 days because of previous commitments. He did, however, leave Mr. Swanson some polygraph release *160 forms to be signed by the persons whom Mr. Swanson wanted to take the test. Mr. Swanson subsequently called a meeting of all petitioner's employees at which he told them of the cash shortage and of his desire to have the employees take a polygraph test as a condition of continued employment. After this meeting, one employee was heard to remark that he would not take a lie detector test. This employee quit his job with petitioner shortly thereafter, but he was never sued, pressured, threatened or blackballed from further employment in gambling businesses by Mr. Swanson. Mr. Dalton also left petitioner's employ within approximately three weeks following the meeting with Mr. Swanson. Mr. Dalton's wife wanted him to retire because he was 71 years old and not well. Mr. Dalton believed if he did not retire he would be fired. Mr. Swanson subsequently fired three other employees whom he suspected of taking cash or of changing losing tickets into winning bets. After receiving the information of the cash shortage in petitioner's business from its accountant, Mr. Swanson instituted the strict system of accounting for cash developed by Mr. Travella throughout petitioner's operation. *161 When Mr. Swanson was informed by his accountant that the cash-on-hand account reflected an end-of-year balance of $107,150, Mr. Swanson and Mr. Travella reconstructed from available information the actual cash on hand as of December 31, 1971, and determined that the actual cash on hand as of that date was $13,224. The cash on hand as reflected on petitioner's general ledger as of December 31, 1970, was $43,092.54. The net change in petitioner's cash on hand in 1971 was $64,057.46. On its Federal income tax return for the year 1971 petitioner reported gross receipts and gross profits of $255,802.71. [3] On this return petitioner deducted $94,891.07 with the explanation "cash shortage." This sum was arrived at by deducting $13,224, the actual cash on hand as of December 31, 1971, from $108,115.07, the book cash on hand, as first computed by petitioner's accountant. This deduction resulted in petitioner's income tax return showing a net operating loss of $33,180.53, which was carried forward and deducted on petitioner's Federal income tax return for 1972. *162 In his notice of deficiency, respondent disallowed the $94,891.07 deduction claimed by petitioner in 1971 under the designation "cash shortages theft loss" and also disallowed the 1972 claimed net operating loss carry-over resulting therefrom on the ground that petitioner had not established that any deductible loss was sustained during the taxable year ended December 31, 1971. In its petition to this Court petitioner alleged that it had sustained a cash loss in 1971. By amendment to its petition, petitioner alleged that it suffered a theft loss in 1972, when the cash shortage was discovered. OPINION Section 165(a) provides for a deduction by a taxpayer of any loss sustained during the taxable year which is not compensated for by insurance or otherwise. The amount of the deduction is the adjusted basis provided for determining the loss from the sole or other disposition of property. Section 165(e) make an exception in the case of a theft loss as to the year in which the loss is deductible by providing that any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss. [4]
*163 Petitioner on its tax return claimed a loss of $94,891.07 as a loss from a "cash shortage" in the year 1971. At the trial petitioner introduced evidence attempting to show that it had sustained a loss by theft and a request was made that it be permitted to amend its petition to claim the loss in 1972, the alleged year of discovery of the theft loss. At the trial respondent's agent testified that he had checked petitioner's records and that there was a difference in the cash on hand as shown by the books and the actual cash on hand in petitioner's business at December 31, 1971. He prepared a schedule which showed that some of this cash shortage had existed at December 31, 1970, and that only $64,057.46 of this shortage was applicable to 1971. Respondent's counsel at the trial stated that he was not contending that at December 31, 1971, there was cash of $107,150 at petitioner's place of business and in effect agreed that Mr. Swanson's estimate of actual cash on hand as of December 31, 1971, of a little over $13,000 was correct. At the trial counsel for respondent stated that respondent contended that the cash shortage was not a result of theft. He stated that respondent's position *164 was that an unexplained cash shortage might well have resulted from money taken out of the business by petitioner's sole shareholder, Mr. Swanson, and for that reason would be in the nature of an informal dividend to Mr. Swanson from petitioner and not a deductible loss. On brief respondent contends not only that the cash shortage might have been money taken out of the business by Mr. Swanson but also that there has been no showing that the total cash intake of petitioner was reported by petitioner as income. Respondent argues that since it has not been shown that the amounts entered on petitioner's records as cash on hand were included in petitioner's reported income, petitioner has not shown a basis in the cash shortage. Respondent also argues on brief, as he did at the trial, that if petitioner has not shown that the cash shortage resulted from theft, the amount of cash shortage loss sustained by petitioner in 1971, if any, is $64,057.46 and not the $94,891.07 which petitioner claimed. Respondent points out that a part of the cash shortage as shown by petitioner's records was sustained in 1970 or prior years which are not before the Court. Whether a theft loss has occurred *165 depends upon the law of the state in which the loss occurred. Monteleone v. Commissioner,34 T.C. 688, 692 (1960), and cases there cited. Petitioner in its brief has not cited the law of Nevada which it considers would govern its claimed theft loss in this case. In its brief petitioner makes some mention of embezzlement and also mentions pilfering from the cash register. However, Mr. Swanson in his testimony in effect admitted that the reason he had not placed charges against any of his employees was because in his opinion, and apparently in the opinion of the lawyer whose advice he sought, he did not have sufficient evidence to show a theft by any of his employees. The circumstances of such a large disappearance of cash as $64,000 in one year creates a suspicion that not all of the loss could have come from inadvertencies such as overpayment of a winning bet but entering on the books the proper amount of the win, payments for items in cash without making an appropriate entry, failing to repay funds legitimately borrowed with a marker, and the like. However, a disappearance of an item, even money, under unexplained circumstances does not in and of itself prove *166 a theft loss.A sufficient showing must be made for the Court to infer that an actual theft of the money was made by some individual. If the funds were lost by carelessness or were by an understanding borrowed but not later repaid, no theft loss has been shown. Howard v. United States,497 F.2d 1270, 1273 (7th Cir. 1974). The evidence on which petitioner relies in this case is (1) that money which came into the business and was not deposited and, according to his books, was not spent in the business was not actually on hand at the end of the year, (2) that under the lax method of accounting for cash in the business there was opportunity for various individuals to pilfer from the cash register, and (3) that one of his former employees testified that on one occasion he saw another employee take some money from the cash register and put it in his pocket. If the record did not show that various individuals were permitted to borrow cash by putting a marker in the cash register, we would be more impressed with the testimony of this former employee. The individual who testified was not close enough to the person he saw take the money from the cash register to determine *167 the amount taken and certainly did not know whether a marker for the money was placed in the register. In our view the evidence here is too meager to sustain petitioner's contention that he suffered a theft loss. See Allen v. Commissioner,16 T.C. 163 (1951). We therefore conclude that petitioner is not entitled to a deduction in 1972 of $94,891.07 or any part thereof as a theft loss. The record, however, is clear that petitioner did have a cash shortage of $64,057.46 in 1971. Since petitioner is a corporate taxpayer, it is entitled to a deduction for this amount if this cash shortage resulted in a loss to it in connection with its trade or business and was not compensated for by insurance or otherwise. Although respondent made some argument that petitioner has not shown that any loss by cash shortage was not compensated for by insurance or otherwise, in our view the record is clear that petitioner did not have any insurance to cover this cash shortage and we have so found. Petitioner did have insurance to cover $7,000 of theft or burglary losses, but for the same reason we have concluded petitioner has failed to establish a theft loss in this case we would conclude *168 that petitioner's insurance, even to the limited extent of $7,000, did not cover the cash shortage loss petitioner sustained in 1971. The record shows that petitioner had no other insurance coverage for a cash loss. Respondent's primary argument is that Mr. Swanson may have himself taken the money and if he did the diverted funds would be in the nature of informal dividends to Mr. Swanson and not deductible by the corporation. See Vassallo v. Commissioner,23 T.C. 656, 662, 663 (1955); Potson v. Commissioner,22 T.C. 912, 931 (1954), affd. sub nom. Bodoglau v. Commissioner,230 F.2d 336 (7th Cir. 1956). However, prior to discussing respondent's major contention, we will dispose of a contention which respondent raises on brief, though not mantioned at the trial, which is that petitioner had no basis in the cash shortage since the amounts have not been shown to have been included in its income.We have held that a taxpayer may not deduct a loss in connection with an income item as distinguished from a capital item unless the income item has been previously reported as income in the appropriate tax return. Alsop v. Commissioner,34 T.C. 606, 609-610 (1960), *169 affd. on other grounds 290 F.2d 726 (2d Cir. 1961); Taylor v. Commissioner,34 B.T.A. 241 (1936). Respondent's contention with respect to whether the moneys which were shown as cash on hand on petitioner's ledger were included in income so that if a loss is otherwise shown to have been sustained, the loss would be deductible is a factual issue in this case. It might have been that petitioner could appropriately have reduced its reported income by the cash shortage sustained in 1971. See Alsop v. Commissioner,supra.However, if petitioner's income was not so reduced, then a deduction for the cash shortage would be appropriate unless as respondent argues the money was taken by Mr. Swanson for his personal use. In our view the record is completely clear that petitioner's income did include all its cash receipts. The general ledger which is in evidence shows the cash taken in on which the ten percent excise tax was paid, the payouts on winning tickets, and the balance which was the amount reported on petitioner's return as its gross receipts and gross income. Respondent's agent testified that he checked the reported amounts received *170 on bets and found them to be accurate and in effect testified that the income as reported by petitioner was correct according to petitioner's general ledger. After a review of the general ledger and petitioner's tax return, we conclude that petitioner's gross receipts, as reported, did include the $64,057.46 of cash shortage. The evidence in this case unmistakably shows this fact and in effect respondent's counsel so conceded. When asked by the Court whether he questioned the actual shortage of cash, he answered: "*** I don't [believe] there is any question that the money came into the business. The books show it, and nobody has denied that, the position." The Court then asked respondent's counsel if he believed the cash was actually there and he answered "No." Since all receipts were reported on petitioner's tax return for 1971, the reported receipts included the $64,057.46 of cash shortage. Respondent's primary contention is that Mr. Swanson may have himself taken the money comprising the cash shortage to use in making personal bets or to use in illegal bettings for petitioner. Although respondent argues to the contrary from some vague testimony from one of the witnesses in *171 this case, in our view there is no evidence in the record that Mr. Swanson placed any bets for petitioner without payment of the Federal excise tax during the year 1971. He testified that he did not, and there is no creditable evidence that he did. Mr. Swanson also specifically testified that he did not take any cash from petitioner without accounting for it either by placing a marker in the cash drawer and later repaying the cash borrowed or by charging himself on petitioner's books for the withdrawal. We consider Mr. Swanson a credible witness and without supporting evidence would be inclined to believe his testimony. However, the record, aside from Mr. Swanson's testimony, indicates that Mr. Swanson did not misappropriate the funds. The big personal bet that Mr. Swanson had to pay off in 1971 was paid off with a $20,000 check of petitioner's which was shown on petitioner's books as having been written and charged on those books against Mr. Swanson's account. In our view Mr. Swanson would not have made this arrangement with respect to the $20,000 he needed in September 1971 if he had been taking cash out of petitioner's business for his personal bets. When Mr. Swanson found *172 out about the cash shortage he called a police official to find out what he should do and consulted his lawyer about it. If Mr. Swanson had been taking the money from petitioner for his own use, these actions would have been unlikely. Mr. Swanson, after the discovery of the cash shortage, changed his bookkeeping system to place very strict cash controls on the business. Had he been appropriating money from the business to his own use, it is unlikely he would have instigated these controls. We conclude from the evidence that Mr. Swanson did not take the money which constituted the cash shortage. Respondent's agent testified that he was unable to find any indication that Mr. Swanson had himself taken the money and for that reason, when he investigated Mr. Swanson's personal tax return, did not recommend the setting up of a constructive dividend to Mr. Swanson on the basis that he had misappropriated petitioner's missing cash. The testimony of one of the witnesses on behalf of respondent was taken by deposition. The Court had no opportunity to observe him. However, in his testimony he was confused as to dates and as to other events. This witness at no point in his testimony *173 suggested that Mr. Swanson might have misappropriated petitioner's funds. The testimony of another witness called by respondent who had been an employee of petitioner was so confusing that the Court commented to this effect at the trial to afford the witness the opportunity to explain the confusion if he could. No such explanation was forthcoming.
On the basis of the evidence in this record we conclude that Mr. Swanson did not appropriate the $64,057.46 representing the cash shortage for his own use. We further conclude that petitioner in 1971 is entitled to a deduction of $64,057.46 for a cash shortage. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.↩
2. Petitioner's books show that the actual book cash on hand as of December 31, 1971, was $107,150. The monthly figures had not been totaled throughout the year, so Mr. Swanson was not aware that the cash-on-hand figure was so high. Respondent's agent computed petitioner's cash on hand as follows: Net Change
Cash
in
Received
Withdrawn *
Cash on Hand
Ending Balance **
Jan.
$ 53,032.75
$ 39,117.82
$13,914.93
$ 57,007.47
Feb.
34,553.80
29,174.84
5,378.96
62,386.43
Mar.
55,012.45
34,285.27
20,727.18
83,113.6 1
Apr.
31,021.47
28,855.92
2,165.55
85,279.16
May
53,100.99
37,796.68
15,304.31
100,583.47
June
35,467.15
32,1 15.57
3,351.28
103,934.75
July
40,549.02
35,666.27
4,882.75
108,817.50
Aug.
31,055.75
32,514.89
(1,459.14)
107 ,358.36
Sep.
44,858.35
52,569.54
(7,711.19)
99,647.17
Oct.
51,422.45
49,083.10
2,339.35
101,986.52
Nov.
56,588.28
48,700.84
7,887.44
109,873.96
Dec.
35,468.18
38,192.14
(2,723.96)
107,150.00
$522,130.64
$458,072.88
$64,057.46
* Withdrawals include bank deposits as well as cash payments for supplies, etc. ** Ending balance in cash-on-hand account as of 12/31/70: $43,092.54. Respondent's agent testified that the information for this computation came from figures posted to the general ledger from the journal. The parties offered the general ledger in evidence as a stipulated exhibit and we do not find these figures in it. The cash received from bets prior to reduction for payouts for each month as shown on the general ledger is as follows: January
$155,477.50
February
110,816.50
March
129,758.00
April
116,535.20
May
155,633.40
June
127,774.90
July
133,615.57
August
128,499.50
September
158,428.85
October
200,994.00
November
156,382.28
December
130,679.80
The above figures as shown in the general ledger are the receipts on which the 10 percent Federal excise tax is shown as paid. The figures shown inthe computation by the agent do not tie in with the income from betting activities as shown by the general ledger which, as we have found, totaled $254,414.65. This figure is shown on the general ledger as being computed each month by subtracting the payouts on bets from the above-listed receipts from bets to arrive at monthly "wins." The monthly "wins" are then added to arrive at the income from betting. The agent testified that the checked bet tickets against reported net receipts, finding them consistent. And, he found that the receipts were consistent with petitioner's tax returns. Petitioner did not object to the computation of net change in cash on hand made by the agent. We conclude from this that the jornals of petitioner must explain the cash "received" as used by the agent and that the net change in "cash on hand" as computed by him in correct.↩
3. The difference in this figure and the income from betting as shown on petitioner's general ledger is a small amount of "other income" from such sources as cigarette machines which is also shown on the general ledger.↩
4. Sec. 165(a), (b) and (e) provides as follows: SEC. 165, LOSSES. (a) General Rule. -- There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) About of Deduction. -- For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. * * *
(e) Theft Losses. -- For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.↩